This case is in re the marriage of Ferguson, B. Carey Ferguson, B. Blade Ferguson. The case number is 4110688 for the appellant Kerry Davis, for the appellant Allen Kretner, Ms. Davis. Thank you, Your Honor. May it please the Court, Counsel. As you've already stated, my name is Kerry Davis. I'm an associate at the Law Office of Barbara Sher. I'm proud to represent Kerry Ferguson in this matter. As I'm sure Your Honors already know, this is a divorce case, but the major issue in this case relates to custody. Our position is that the trial court's decision was against the manifest weight of the evidence, that it contained no specific findings, and that it seems to completely ignore the best interest standards that the courts have set for the trial courts to make decisions in custody cases. Well, you say that the trial court ignored those standards. How do we know that? Well, our position would be that the facts that came out during the trial, as well as some of the petitions and pleadings that were contained in the record, show a very different, we would apply those facts to the particular factors in the best interest statute and come up with an entirely different result. Basically, you're just saying you disagree with the trial court. Not entirely. You can't say the trial court just ignored everything. I agree that the trial court didn't say what the trial court probably should have said in his order, but you can't necessarily, because he didn't say anything, you can't say he ignored everything, can you? You can't necessarily really say anything in this particular case because the trial court left both your honors, as well as both parties, at a disadvantage by not making any specific findings of fact or stating anything about the best interest of these children other than he considered applicable statutes when making the decision. Did you file a petition for re-hearing asking the trial court to do what you think the trial court should have done? We did, Your Honor. Asking for specific findings? We did not file asking for specific findings, no. Okay. In the decision, the trial court didn't indicate specifically whether he was awarding sole custody to Blade or whether he was awarding joint custody to the parties. I guess I'd say to the court that because there was a judgment that was prepared by Blade's attorney, the result is that sole custody was given to Blade. As I've already said, there's a difficulty here because obviously the trial court is in a better position to judge the credibility of the witnesses as well as the evidence, but because there's no specific findings and because the record does not support the decision by the court, we're all sort of sitting here, at least myself, wondering why it was that the court made the decision that it did. Specifically, I think the facts that are important to the case at hand. It's obvious from a reading of the record and the testimony of the parties. They had a very on-again, off-again relationship. They had one. The first child, Gage, was born in September of 2002. They married shortly after. In November of 2002, Carrie originally filed for divorce in 2005. The parties briefly reconciled. As a result of that reconciliation, Carrie got pregnant with her second child, Mercy. During most of the time, the parties did live together in a home in Mount Olive, and after separating for the final time, Carrie moved out of the marital residence, still residing in Mount Olive for a short period of time. There was a mediation order that was entered in this case, and it's incorporated into the record because the mediator actually filed it in the family law case. The mediation report states that the parties shall share custody of Mercy and Gage, and if you look at it, Blade received the children on the nights that Carrie worked. He received them every other weekend, but Carrie had them at all other relevant times. It also specified, and this ended up being a specific point of contention, that each of the parents should have two weeks of uninterrupted summer vacation. They had to give the other party 30 days' notice. This became problematic because in the spring of 2010, Carrie decided to move to Highland, which is about 30 minutes away from Mount Olive. This wasn't a decision that happened by her just arbitrarily deciding to do so and not discussing it with Blade. She did so because it was closer to her place of employment, and she felt like it was a better school district, just a better community to raise the children in. The testimony that the court heard was uncontroverted, that Blade encouraged Carrie to make the move to Highland, that he understood that Carrie intended to enroll the children in the Highland School District, and he actually helped Carrie select the apartment that she moved into and helped her move into the new home. At no time during this process did he tell her that he intended to fight her on her enrolling the children in Highland. He remained silent on that issue. Carrie was under the impression that this would not be a problem. She was the primary caretaker of the children throughout the majority of their lives. In fact, for most of the children's lives, Blade did not even have a driver's license, so she was doing all the transportation to and from school, medical appointments. She was basically doing everything for the children. She in no way thought that there would be a problem enrolling the children in Highland and having Blade receive liberal visitation. However, what ended up happening is that prior to the children starting school, Blade indicated to Carrie that he intended to utilize his two weeks of summer vacation. She told him that he couldn't do so because the children were starting school and daycare. She was also fearful about what would happen because of the court order that stated that he was to have two weeks of uninterrupted visitation upon 30 days notice. So what ended up happening were all parties appeared in front of the trial court on August 18th to determine what school district Gage would go to. The judge indicated that on a temporary basis he was going to keep Gage in the school district of Mount Olive because it's a school district he went to the prior two years, and that he was not having any prejudice against either party for a final determination. The timeline, I think, of these proceedings become important because the case was originally set for trial in October of 2010. Blade's attorney filed a motion to withdraw. The case then was set for December 9th. Testimony was heard. Because of the length of the testimony, another day of trial was scheduled.  It was continued by the court. It ended up being continued again because of weather, and the trial finally concluded on April 12th of 2011. So because of factors that were outside of Carey's control, Gage ended up spending most of his third year of school in the Mount Olive school district. Your Honors, we would submit that one of the most egregious faults on the part of the trial court is his assessment of the credibility of the witnesses. And as I stated before, obviously the court's in a better position to judge them on a trial court level. But if you read the record and you read the testimony of the parties, you'll see that Carey is a cocktail waitress, and she was at one time a stripper. But her testimony, and all the testimony that was heard, was that she was a very, very good mother, and that she actually began working as a stripper because Blade asked her to do so because he was not making enough money to support the family, and he knew that that would be a lucrative job for her. She does not have an education beyond high school. She doesn't have a big skill set. That is something that she decided to do. As you'll read through the record, Blade's attorney makes a lot of mention of the fact that she was at one time a stripper, that she still works in a cocktail lounge, and somehow trying to indicate that that doesn't make her a good parent. Is there any indication that the trial court held that against her, though? Again, it's very difficult to understand why the trial court made the decision. My assumption would be that they did hold that, he did hold that against her. The reason that I would assert that is because, by all indications, Carey has never committed a crime. She was a good mother. She provided for these children's day-to-day needs. In no way, there were some things that were questioned on the part of Blade about her being fired from a job or a man that she chose to have living in her home. However, nothing was actually presented in terms of real evidence. What we do have on the part of Blade is that he is a convicted felon, that during the marriage he was charged with aggravated battery, he was charged with domestic battery. You're having a hard time persuading me that you think the trial court may have held the fact that she had worked at a men's club against her, but did not hold his conviction against him, I mean Blade's conviction against him, felony conviction. That seems like a stretch to me. Well, the court looked at the testimony of both the parties. The other testimony was from both of their parents, which I would submit and would hope the court would look at and give the appropriate weight to be given. Clearly, the court took away this joint custody situation that was happening and awarded sole custody to Blade. So in that vein, it would seem as if the court did believe that Blade was the more truthful of the two of them. And because of that, I would submit that he did not take into account all of the criminal charges that Blade has received in his lifetime, the fact that he has been convicted of two DUIs, and some of the bad judgment calls that he made during the time that the parties had been separated, such as the fact that he let his father, who's been convicted of three DUIs, watch the children. His father admitted on the stand he still drinks fortified beers a day and that he consumed fortified beers during the time that he was watching the children. That's what we have on Blade's side. We have criminal convictions, which if we were in a criminal court, the fact that he was convicted of a felony would absolutely be read to the jury, and the jury would be allowed to consider it against somebody's credibility. And then we have Kerry on the other side, who the worst thing that you can say about her is that she is employed in a gentleman's club and that she at one time was a stripper. Lots of accusations were thrown out in the trial court level. Nothing stuck. Those are what we're dealing with. We're dealing with two parties. We have to assess which one's more credible. I would hope and would think that on the trial court level, they would look at the convictions, criminal activity of both of the parties. And to me, it doesn't seem as if that was done. After getting through the credibility of the witnesses and trying to look at the best interest standard that the court has laid out, again, I think we're looking at a situation where the court just blatantly ignored some of the issues that were presented by way of testimony at the trial. There are a couple of the factors, such as the wishes of the child as to his custodian. As the court can read, Gage was interviewed in camera by the court. He indicated a slight preference to stay with his dad. That was clearly based on the fact that this is the home that he had resided in for some time. This is the school district he had been in. He had some kids that he played with in the school district. But at this point, Gage, and at the point of the trial, he was 8 years old, and Mercy was 5 years old. And as I've stated in the brief, the courts have been clear about the fact that you can look at the age of the children and what are the factors that are relating to why the children want to remain or want to go to one home or another. So I would submit that that factor should not have been taken or been given great weight. Again, I don't know if the trial court did give it great weight because it made no specific findings that relate back to the factors that the legislature has enumerated that he should look to. So along that vein, the child's adjustment to his home, school, and community. Again, these are very young children. They're spending a lot of time with Carrie. They're spending a lot of time with Blade. They're back and forth a lot. They are in the Mount Olive School District, but clearly at that young of an age, if they had to switch schools, Mercy hadn't even started school, it wouldn't be that great of a deal. If we remanded this case back to the trial court with directions, that the trial court make specific findings upon findings of what he took into consideration specifically in making the custody award that he did, and you then appealed for that new finding that corrected the lack of findings that you complain about here, what would be our standard of review of those findings? Well, obviously your standard of review in a case like this is to give great deference to the trial court. And I understand that you're in a position where you don't have any findings. It's almost an impossible question to answer. If you sent it back to the trial court, I would submit that your job would be a lot easier as well as my job. Wouldn't it be against the manifest way to the evidence? Yes, sir. And that's the same standard we're dealing with here, right? Correct. There was also quite a bit of testimony concerning some of the abuse that was happening in the house during the time that Blade and Carey were living together. And as the court is aware, in Henry, Marriage of Padiac, the court doesn't have to limit its consideration to cases where there's actual harm and can consider both present actual harm to the child as well as the likelihood of future endangerment. They can consider the fact that there was abuse in the household even if it wasn't against the children. I think some of the most disturbing testimony was from Carey's son from a prior relationship, Aubrey Aubuchon, as well as Blade, of an incident that happened in about 2005 in which Blade threw an ice cube tray at Carey. It hit her in the eye. She ended up having to go to the emergency room and get some stitches as a result of it. Carey testified to other incidents of violence, specifically having to call the police because of domestic violence that happened in 2008. If you believe Blade and his attorney's side of the story, the parties had a very tumultuous relationship, and Carey was just as much at fault for the abuse as Blade was. The court was present, though, and observed the parties.  Carey is a woman who barely weighs 100 pounds. She is about five foot four. Blade is taller. He weighs more. He's stockier. He looks as if he works out often. It is preposterous to assume that someone that size could do damage. Someone Carey's size could do damage to somebody that is Blade's size. And furthermore, Carey has never been arrested. She's never been charged with a crime. She's never had an order of protection entered against her. So, again, this seems to be one of the factors that the court did not consider. If it did consider, it certainly didn't give us any direction in terms of why the abuse that was clearly happening in the household that was uncontroverted wasn't considered when trying to make a determination of which parent would be the more suitable custodian for the children. The willingness to facilitate a relationship with the other parent is also cause for concern if you read through the testimony of both of the parties. There was some testimony about each one of them and their failure to adhere strictly to the mediation order. And that was a big criticism of Carey. But through the testimony of Blade, he didn't have a driver's license for a significant period of time. And so during that entire time he didn't have a driver's license, the mediation agreement was modified to allow him to drop the children off an hour earlier. Yet when Carey wants to do the same thing, when she wants to try to modify it and not so strictly adhere to it, we have instances where he calls the police and where the police have to show up for visitation exchanges. I would submit, Your Honors, that the court did not take this case seriously enough and did not consider what was in the best interest of these children. He changed entirely the custody arrangement between these two people in that while they had shared custody before, he gave Blade sole custody of the children but kept the mediation agreement, which so clearly was not working if you read through the testimony of these two parties, and left that to them to try to adhere to. It requires Carey drive from Highland to Mount Olive several times a day sometimes because the mediation order is just not set up for the kind of living arrangements that they have right now. So for all of those reasons, we'd ask the court to reverse and remand. Thank you. Thank you. You'll have rebuttal. Mr. Pratt. May it please the court and counsel, as in most divorce cases you're dealing with two people who are not perfect by any stretch. Judge Lonergan, in his docket entry of 6111, states the court, after reviewing the position statements of the parties, its own notes and the appropriate statutes, has determined custody of the minor children to be awarded to Blade Ferguson. As the court knows, Judge Lonergan is not required to make specific findings regarding why he made the decision that he did. And I believe that he stated appropriately what he considered. Having been trial counsel along with Ms. Davis, what I believe took place and what I think the facts showed was that Blade showed that what came first in his life were his children. He made decisions concerning his employment. He made changes in his life. He did things for the children that Carrie was not doing. Blade kept a diary, Respondents Exhibit 2, which was commenced in the spring of 2009, regarding his involvement with the children as well as Carrie's involvement with the children. And I believe the facts elicited from that diary, along with Blade's testimony, were very poignant regarding the issue of custody. Also, when it comes to credibility, I think the facts were clear that the judge considered Blade, even though he had some prior convictions, the one felony conviction which took place over 10 years ago, and I think was 15 years ago, I think he considered Blade to be more credible. The court reads the facts of the case. It will find that Carrie admitted she had a job at one gentleman's club that was fired for stealing. She did not say that she didn't steal. She just said that's why she was fired and she went to work at another gentleman's club. She also indicated in the first day of trial that she further testified that Todd, the tattooed gentleman that she had been living with, that there was some evidence regarding his indiscretions regarding drugs and that the kids didn't like him and sex in the... He had friends who were having sex downstairs while the children were present. She testified that Todd did not really interact with the children and the relationship is now over. When the court interviewed Gage, Gage testified that... Gage testified when he goes to his mom's house, Todd is there and he does not like that he comes over. Gage testified that Todd visited a week ago for a couple days and stayed overnight. Gage said that he has known Todd for quite a while and he described him as tall with a bunch of tattoos on his arms. Now, I don't believe that the judge took Gage's testimony, thought that his preferences were that telling or required the court to allow him to live with his father. I don't believe that at all. I believe, though, that the court considered the fact that Gage told him that basically his mom had told a fib about not living with this person or not seeing him as a boyfriend on a regular basis. That wasn't true. So that goes to credibility also. Not a big deal overall, but a big deal when you consider the fact that Gage had made... or that the father, Blade, had made arrangements with his employer to work days so he could be home with the children, made sure they did their homework, got them ready to go... or got the older son, Gage, ready to play in his wrestling matches, informed counsel's client about the wrestling match. She didn't attend the wrestling match because she had to throw out beats at the Mardi Gras celebration in Soulard during Mardi Gras. So that was her choices. That's the kind of choices that she made. That's the kind of evidence that was presented. And that's the reason why the judge did what he did. He gave custody of the children to the parent he thought would benefit the children the most. And I think he weighed all the factors set out in 602, and I think he did the right thing. I think that's clear. Obviously, the standard of proof is you have to find that somehow the judge's decision was against the manifest weight of the evidence. If you read the factual statements, the facts that were presented at court, I don't think you could make that decision. You could also find that there was an abuse of discretion. Obviously, that did not happen in this case. Court heard the evidence of the parties, heard the testimony of the parties, saw their demeanor, was in the best place to judge who was most credible, who was not, what was in these children's best interest, and I think did a great job. And I think also, you know, Judge Lonergan has a rule. He doesn't want either attorney in the room when he interviews minor children. I know that kind of goes against the statute, but most of the time we agree to that. And this is one of the first times I've got to see how Judge Lonergan interviews a child, especially one of Gage's age, and I think he did a great job with Gage. And I think that he got some information out of Gage that perhaps others, he might not have gotten had the attorneys been in the room. So I think in this case that that worked out, but I don't believe that he gave undue credence to anything Gage had to say regarding his choices. Blade, in his testimony, showed that he was concerned about the children's grades. They had made good grades while living with him. He was concerned about the children's absences. The absences were caused by the mother either picking the children up early or not taking them to school at all. And this was unrebutted evidence. This was not mentioned at all by Carrie in her testimony or on rebuttal. There was no post-trial motion filed in this matter requesting that the court give findings as to why it made the decision that it did. And there were extensive post-trial arguments made and filed and are part of the record by both sides. So the court had an opportunity to read those position statements prior to making its finding. The issue of back before the children were born, or maybe when Gage was a baby, the issue of Carrie becoming a stripper and Blade asking her to do that was in dispute. Blade denied that. Blade indicated it was her idea, but he went along with it. Realized that after he went along with it, it was a bad idea because things weren't working out. Carrie was not coming home at night at times and it wasn't a real good situation. So eventually she quit. The same with the alleged abusive conduct, the ice tray. Blade admitted he got mad. There was some dispute in the testimony as to whether either of the two minor children involved in this case, well one wasn't born, the other one would have been very small, but there was a dispute as to whether that child was present. One of counsel's witnesses testified, I believe, that the only child that was present was Aubrey. Aubrey, the Carrie's child from a previous relationship. Blade testified that what happened was Carrie had said something to him and he got mad and threw the ice tray and hit the table and bounced up, hit her in the eye. Now, counsel brings up the description of the parties and their size. Well, we're dealing with two fairly small individuals. My client weighed more than her client. Her client having worked as a, I mean, she's 104, 105, 110 pounds. A person's size, it's not the size of the dog in the fight, it's the size of the fight and the dog. And I can tell you that the evidence was clear, I think, to the court, that Carrie had just as much of the ability to cause a physical altercation and admitted to being involved in the physical altercations with her husband as my client. She admitted to starting some of the physical altercations. And the testimony regarding the order of protection that Carrie received, she wanted to go to Texas, she wanted to take the kids with her. Blade said, no, this was after they separated for the second time. Blade said, no, I don't want you to do that. She said, well, I'll get to do it anyway. So she runs out and gets an order of protection. My client doesn't get to see the children for six weeks because he came to hire me. I wasn't available to go to court. When we go to court for hearing on an order of protection, what happens? Carrie doesn't show up. The order of protection is dismissed. There was also a criminal charge filed. Never showed up for court, never talked to the state's attorney. Those charges are dismissed. All this evidence came out. So when you consider all the things that happened, especially the fact that Blade had made major changes in his life, you know, what were you doing 15 years ago is what I say to myself. What was I doing 15 years ago? Could I have changed? Well, I can tell you what, there's a big difference between being 19 years old and being 34 years old. And he made some changes and realized, hey, these are my most important priority. And I think the judge saw that and the judge ruled as he did. And I'm happy that he did for these children. Thank you. Thank you. Mr. Pretner. Ms. Davis. Just briefly, thank you. Again, I would reiterate that the allegations that were made against Carrie, both at the trial level and today, are very trivial in comparison to the allegations that have been made against Blade and some of the things that he has admitted to doing. If you read through the record, Carrie never admitted to starting any of the altercations. Carrie, again, was never arrested. She never had any problems with the law as opposed to Blade, who absolutely did. In terms of the absences, that is one of the more significant allegations against Carrie. She was scrambling to see her children as much as she possibly could. The mediation agreement forced her to have to drive to Mount Olive from Highland several times a day while trying to also bring money in and provide for her children. And again, with the scheduling, Blade is often unemployed. When he is employed, there are times that he has to travel, and he did testify as to that. Carrie's profession, while some may look at it with disfavor, allows her to have a schedule that is very conducive to being able to take care of the needs of these children. She works at night. She is able to be there for the children when they get home from school. She's able to get them fed, get them to bed. She doesn't have to leave for her job until after they've already fallen asleep. She testified that she had secured a babysitter in her apartment complex that would come over to the house, watch the children while they slept. This person was a registered EMT, and that then she would be back home in the morning to have the children get ready, get up, get fed, and get off to school. She is struggling right now, and it is difficult. The mediation agreement that the judge kept into place is clearly not working in this case. And in terms of Blade changing, what I would submit to the court is that if during May of 2010, the spring of 2010, the summer of 2010, when these discussions were being had between Carrie and Blade concerning Carrie moving to Highland, when she was so clearly telling him that she was intending to enroll the children in the Highland School District, if at any point he would have indicated to her that he was not in agreement with that or that he was going to fight her for sole custody of the children, we wouldn't be in the situation that we're in here today. He let her believe he was fine with it. She moved. He helped her move. He drove with her to select an apartment. That's manipulative behavior on his part. He was manipulating the situation so that he could turn around and try to get sole custody of the children and leave her in a position where she's having to do the driving and she looks like the parent who's doing a bad job. He's manipulative. He's been abusive in the past. He got away with it. We have no specific findings as to why he did so, and now the kids are suffering as a result. Again, we'd ask the court to reverse and remand and appreciate your time. Thank you. Thanks to both of you.